UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**RHODA J. BUTLER,**

                                        **Plaintiff,**


                    **-v-**                           **1:10-CV-679 (NAM/RFT)**


**THE CITY OF GLENS FALLS, THE GLENS FALLS
CITY POLICE DEPARTMENT, GLENS FALLS
POLICE OFFICER G. JOSEPH BOSCLAIR &
other as yet UNKNOWN MEMBERS OF THE
GLENS FALLS POLICE DEPARTMENT,**

                                        **Defendants.**


✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

The Law Office of Eric Schneider, P.C.
Eric Schneider, Esq., of counsel
41 Pearl Street
P.O. Box 3936
Kingston, New York 12402
Attorney for Plaintiff

Carter, Conboy, Case, Blackmore, Maloney & Laird, P.C.
James A. Resila, Esq., of counsel
Luke C. Davignion, Esq., of counsel
20 Corporate Woods Boulevard
Albany, New York 12211

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

        Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("section 1983") and New York

State law.  Her claims stem from an incident in which her adult son, who had recently moved out

of her house, attempted to retrieve some of his belongings with the assistance of Officer Boisclair

of the Glens Falls City Police Department.  The complaint includes Fourth Amendment claims of

warrantless entry, excessive force, and arrest without probable cause, as well as a First Amendment retaliation claim. Defendants move (Dkt. No. 19) for summary judgment. As set forth below, the Court grants the motion in part and denies it in part. The Court also issues a conditional preclusion order regarding plaintiff's psychologist's records.

**FACTS**

The facts set forth herein are undisputed unless otherwise stated. Plaintiff's son Matthew Butler had lived in plaintiff's home for about three months, and had moved out on Saturday, March 7, 2009. On March 13, 2009, Matthew asked the Glens Falls Police Department to send an officer to be present when he returned to plaintiff's house to retrieve his belongings. When Matthew arrived at the house, plaintiff confronted him and said she was going to call the police. He responded that he already had done so, and that an officer was on his way. Plaintiff then telephoned the police department, which confirmed Matthew's statement.

Defendant Glens Falls Police Officer G. Joseph Boisclair[1] ("Officer Boisclair") was dispatched to the residence to mediate and maintain peace during the property removal. On arrival, he spoke to both Matthew and plaintiff outside the residence in the driveway. He learned that Matthew had been living there for a few months, had moved out, and wanted to enter the residence to retrieve his belongings. Matthew stated that he needed about an hour to obtain all of his belongings. Officer Boisclair said that was too long, and Matthew agreed that he could obtain necessary belongings, including his bed, in about 15 minutes. Plaintiff went inside the residence.

---

[1] Officer Boisclair's name is incorrectly spelled in the caption as "Bosclair." The Court uses the correct spelling of his name.

Events after this point are in dispute.  Officer Boisclair testified at his deposition on May

5, 2011, that, after talking to him and Matthew in the driveway, plaintiff went inside the house.

Officer Boisclair stated that plaintiff then invited him to enter the house.  He testified:

> Q. How did you come to be in Ms. Butler's home?
> A. She asked me to come inside the house.
> Q. For what purpose?
> A. At the time, when I went in, I didn't know.  But when I got in the home, she advised me that she was on the phone with her daughter and her daughter wanted to talk to me.
> Q. Did you speak with her daughter?
> A. No.
> Q. Why not?
> A. Because I didn't need to.

Officer Boisclair stated that while he was in the house, he remained in the area near the front

door; and that after talking with plaintiff he attempted to leave the residence.  He stated that

plaintiff "had locked the door while [he] was inside the residence, preventing [him] from

leaving."  He further testified:

> Q. Did you ever say, I am going to arrest you?
> A. Again, I told your client on a couple different occasions, I advised her that the choices she was making could lead to her arrest.
> Q. What kind of choices?
> A. Well, I had advised her that by intentionally denying somebody access to their property, she was in violation of Penal Law Section 155.25, which is petty larceny. You cannot intentionally deny somebody access to their property.
> ***
> Q. You said choices, plural, that my client was making. What were some of the other things?
> A. When your client had locked me in her house, I advised her that if she didn't open the door and let me out, that she could be arrested for obstructing governmental administration. At that point in time, she told me I was going to have to arrest her because she wasn't opening the door.
> Q. Did my client give you a reason for locking you in her home?
> A. She said I was just going to let her son in.
> Q. How close were you from the door when my client allegedly locked the door of her home?

A. Probably about eight to ten feet.
Q. Where was my client standing?
A. Right next to the door.
Q. Then what did you do?
A. I told her a couple of different times that she needed to open up the door.
Q. Then what happened?
A. When she refused, I went over and I unlocked the door and I opened it.
Q. Then what happened?
A. Your client fell down.
Q. Did the door strike her at that time?
A. Not to my knowledge.
Q. Do you know what caused my client to fall down?
A. No.

Plaintiff gave her version of events in her New York General Municipal Law 50-h hearing on October 20, 2009. She testified as follows:

Q. What happens when the police officer gets there?
A. He starts talking to Matt. I went over to him and said, "You need to tell him to move his vehicle. I have a 6:30 appointment. And also his girlfriend does not belong here, he was told not to bring her on my property."
***
Q. So, you informed the police officer of that information that, one, you had to leave and, two, that his girlfriend wasn't welcome at your property; right?
A. Right.
Q. Where were you when you had that conversation?
A. In the driveway.
***
A. ... I'm standing sort of close to the policeman saying, "He needs to leave now."
Q. And what happens next?
A. Um – he says, "I'm going to talk to your son for awhile." I believe he said that to me. I went in the house, and I believe at that point I had Kim on the cell.
Q. Now, who is Kim?
A. My daughter.
Q. And you were speaking to her about what was going on?
A. Yes.
Q. Where does Kim live, or where did she live back in March if it's different?
A. She lives in North Miami Beach, Florida.
Q. And what did you and Kim discuss?
A. I told her that the policeman was here, Matthew was in the driveway, he

-4-

wasn't doing anything about it. The policeman –

Q. When you say he's not doing anything about it, you're referring to the police officer is not doing anything about Matthew being there?

A. Getting off my property. And the policeman told me he had a right to be there.  This was outside before I came in the house. Can we back up?

Q. Sure.

A. He said, "He has a right to be here, he's a resident."  And I said, "He's not a resident, he moved out last weekend." And he said, "He's still a resident if he has property here."  And I went in the house and I spoke to Kim.  And then he knocked on my door – the cop.

\*\*\*

Q So, the officer is present, he knocks on your door?

\*\*\*

A. I wasn't going to let him in.  And he said to me, "Let me in or I'll arrest you."  So, I thought, okay, I better let him in.  So, I did.  And walked in and it was, like – can I show you if I describe it while I show you?

Q. Yeah, if you describe it while you show me, that's fine.

A. This is my couch, and this is my front door. And he walked in and he kept backing me up. He, like, came in my personal space. And I backed up like this, except my couch is not as long as your table. And I came around like this. And I was in front of the couch but my couch is not this long.

Q. So, you backed up to a point where your couch was between you and the officer?

A. No. Because he ended up right there.  He kept backing me around.  And he stood right there....

\*\*\*

A. And I said to him, "What's your name?"  And he wouldn't answer me. And --

\*\*\*

Q. So you asked the officer for his name for the first time while he was in your house?

A. And he wouldn't answer.  And I said, "We're not supposed to do this now. I have plans to leave...."  And he wouldn't answer me.

\*\*\*

Q. You're at a point where you're in the house and you have described for me how the officer came into the house and you backed around.  And now you're all the way around to a point where you can see out of your picture window on the front of your house; right?

A. Yeah.

Q. All right.  Now, you said that Matthew was across the street.  Do you own the home across the street?

A. Yes.

Q. And do you rent that home?

A. At that time, right then –

Q. Uh-huh.

A. – nobody was living in it....

\*\*\*

Q. So, if I'm correct you described for me that Matthew – you observed through your picture window your son Matthew entering into the garage of [the house across the street].

\*\*\*

A. He had some stuff in the garage over there and the shed.

\*\*\*

A. I saw him go in and I said to the officer – I said – because I'm standing there – I said, "Well, how he's going into the house across the street and he doesn't belong there, and you can't tell me he's a resident of this house and that house, you need to go tell him to get out of there."

Q. Okay.

A. And the officer said to me, "Do you own the house?" And I said, "Yes, I do." And then he didn't answer me.

Q. Now, your daughter Kim is on the phone the entire time?

A. Yes.

Q. Did she overhear parts of the conversation between you and the officer?

A. Yeah. Well, at this point when he wasn't talking to me, he's not doing anything about what Matt is doing, I said to Kim, "Kim, he's not saying anything to me, he's not answering." And I went to hand him the phone because he's standing here like this at the end of the couch.

\*\*\*

A. Arms crossed over the front of his chest. And Kim said, "Give him the phone and I'll talk to him." Because I was getting really frustrated. He wouldn't answer at all. And I gave him the phone and he wouldn't – he wouldn't take it. He just stood here like this with the arms crossed.

Q. Okay.

A. And I said, "Kim, he won't take the phone." And she said, "Put it on speaker."

Q. Did you? Did you put it on speaker?

A. Yes, I put it on speaker and she said, "What's going on there, what's happening, what can I do to help?" And he wouldn't answer her.

\*\*\*

A. And he's not answering. And she's on speaker. And then I said, You need to leave my house, you need to leave right now."

Q. And what's the officer do at that point?

A. He starts walking toward the door. And I started to circle back around the couch so I could lock the door the second he walked out.

Q. Uh-huh.

A. And he opened the door, I saw this much – like, five, or six, or seven inches opened. And then whammo, it went right against me and I went flying.

Q. ... The officer begins to open the door as if he were going to exit?

A. I thought he was going out.

\*\*\*

Q. And you were now standing where at this point?

A. Right behind him. I was going to lock it just as soon as he was out the door.

Q. So, you're right behind him?

A. Yep.

Q. And what happens?

A. He took the door –

Q. You're standing behind the officer, and the door is in front of him; right?

A. It's in front of him, and he's in front of me, and I'm just standing there. We're on the stone entranceway.

Q. Inside your house?

A. Yes.

Q. Getting ready to go outside?

A. He was. I wasn't.

Q. You were right behind him?

A. Yeah.

Q. So, he opens the door a little bit.

A. Yep.

Q. And then describe for me what happens.

A. He just took the door and slammed it against me. And that's the last I knew for that moment.

Q. Let me back you up. I just want to make sure I'm getting a good understanding of what's going on. He opened the door the rest of the way and slammed it against you?

A. All I saw was six inches. I never saw anything after that.

Q. I'm trying to get the logistics of what happened. He's standing in front of the door, and you're standing behind him; right? And the door is in front of him.

\*\*\*

Q. What happens next?

A. I'm getting ready to lock the door just as he goes out. Now, he must have circled around because the door hit me right in the –

\*\*\*

Q. Well, let me ask you this question: Do you now at this point – or at some point you had come to be in front of the door?

A. Yes.

Q. All right, Is it your testimony that the officer pushes the door open and hits you with the door?

A. Yes.

\*\*\*

Q. And what happens to you when the door comes into contact with your body?

A. I remember going like this and trying to catch something to catch me.
Q. All right. So, you were reaching out with your hands trying to grasp something.
A. And there was nothing to grasp. There's like a book shelf behind me, there's a little wood table with knickknacks and glass on it, the couch is in front of me. But I couldn't grab anything. And then I'm laying on the floor....

In her deposition on May 5, 2011, plaintiff gave a similar description of the incident.  When asked what happened after she let Officer Boisclair into the house, she testified:

Q. While the two of you were in the house together before the incident, what did the two of you talk about?
A. I believe I first offered him the letter of communication that's right there, the email where Matt and I communicated during the week that I had plans Friday night and we would meet Saturday or Sunday. So I offered to show that to him and he didn't answer me. I asked him what his name was, he didn't answer me.
Q. Was the officer in his uniform?
A. Yes.
Q. Black uniform?
A. Yes.  In Glens Falls they usually have a little bar with a name. It wasn't on there, and I asked him his name and he didn't answer me. And our conversation went like this: I said, I had an appointment and Matt couldn't come in tonight to do it. And he said, He's coming in because he is a resident here. And I said, He's not a resident here because he moved to Sagamore Street a week ago so he is a resident there. He said, He is a resident here as long as he has his belongings in the house, and I said, You can't be a resident of two places. He said, He is a resident here, he's coming in. And I said, No, he's not.
***
A. ... and he wouldn't listen to what [Kim] said, he didn't answer it.  And then I felt uncomfortable, because I don't know his name and this is not how a cop usually acts...."

After she fell, plaintiff was taken to the hospital in an ambulance.  It is undisputed that, as plaintiff was being removed from her home by emergency medical technicians, Officer Boisclair wrote up and left on her table an appearance ticket charging her with obstruction of governmental administration under New York Penal Law 195.05.  It alleges that Rhoda Butler:

did intentionally obstruct and impair a police officer from performing an

-8-

official function by means of physical force, specifically, said defendant did lock front door of residence and physically obstruct same as officer was attempting to exit residence to speak with defendant's son who was there to pick up personal property.  Defendant [Rhoda Butler] did attempt to bar officer from exiting residence.

When plaintiff appeared in court on the return date of the appearance ticket, City Court Judge Richard P. Tarantino *sua sponte* dismissed the charge against plaintiff "in furtherance of justice" pursuant to New York Criminal Procedure Law §§ 170.30(1)(g) and 170.40.  Judge Tarantino stated on the record that the dismissal was "neither an acquittal of the charges nor any determination of the merits, rather it leaves the question of guilt or innocence unanswered."

## DISCUSSION

Defendants move for summary judgment dismissing all twelve causes of action. Summary judgment is appropriate when there is no genuine issue with regard to any material fact, and the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Stated otherwise, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  When deciding a summary judgment motion, the court must "resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion."  *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

In her Memorandum of Law, plaintiff argues that summary judgment would be premature because there has been no deposition of Kim Butler, plaintiff's daughter.  According to plaintiff, Kim heard the incident contemporaneously while on the cell phone with plaintiff.  Defendants point out that they made the instant motion on July 21, 2011, well before the close of discovery

on October 1, 2011.  Plaintiff did not file her opposing papers until October 28, 2011, after

obtaining two extensions of time.  Plaintiff had ample opportunity to arrange to depose Kim, yet

she did not do so.  Plaintiff does not explain why she did not depose Kim, nor has plaintiff

submitted an affidavit from Kim.  Plaintiff is not entitled to an adjournment or denial of summary

judgment on this ground.

Plaintiff has never identified defendants "unknown members of the Glens Falls City

Police Department."  All claims against them are dismissed.

**First Cause of Action – Warrantless Entry Without Justification, Fourth Amendment**

The first cause of action, under 42 U.S.C. § 1983 ("section 1983"), claims that plaintiff

was subjected to a warrantless entry in violation of her Fourth Amendment rights.[2]  Plaintiff bases

her claim on the allegations in the complaint that, after she went inside the house, Officer

Boisclair "started banging on [her] storm door while shouting 'Let me in or I will arrest you'";

"forced his way" into plaintiff's home; "coerced her to back away from the doorway into her

living room"; and did not leave until she made "numerous requests" that he leave.

In contrast, Officer Boisclair testified that plaintiff requested and consented to his entry,

and that his conduct upon entering was consistent with that consent.  The record clearly presents

questions of fact regarding whether Officer Boisclair entered with or without plaintiff's consent.

Defendants argue that, regardless of whether plaintiff consented, Matthew gave effective

consent to Officer Boisclair's entry.  The record does not conclusively establish whether, based

on the facts available to him, Officer Boisclair reasonably believed that Matthew was an

appropriate third party capable of giving valid consent to the entry and, if so, whether Officer

---

[2] There is no evidence or allegation that Officer Boisclair conducted a search.

Boisclair reasonably concluded that Matthew had in fact given such consent.  *See Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 53 (2d Cir. 2003); *see also Moore v. Andreno*, 505 F.3d 203, 208-09 (2d Cir. 2007).  Nor does the record establish whether any consent Matthew might have given was effectively countermanded by plaintiff.  *See Georgia v. Randolph*, 547 U.S. 103, 114-15 (2006).  Accordingly, summary judgment on the ground that Officer Boisclair's entry did not violate plaintiff's Fourth Amendment rights is denied.

Finally, defendants argue that they are entitled to summary judgment dismissing the first cause of action on the ground that Officer Boisclair's actions in entering the home were protected by qualified immunity, *i.e.*, that it was objectively reasonable for him to believe his actions were proper, or that officers of reasonable competence could disagree on whether Officer Boisclair's actions were proper.  *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  Material questions of fact exist on this issue.  Accordingly, summary judgment dismissing the first cause of action is denied.

**Second Cause of Action – Arrest Without Probable Cause, Fourth Amendment**

In the second cause of action, also a section 1983 claim, plaintiff alleges that Officer Boisclair infringed her Fourth Amendment rights by arresting her without probable cause.  In her Memorandum of Law, plaintiff argues that "plaintiff was under arrest when [Officer Boisclair] remained at her home despite her having told him to leave, thereby restricting her movement and liberty[;] the defendant had no right to do so and the plaintiff's confinement was not privileged."

Except for the requirement that the constitutional tort be under color of state law, the elements of a section 1983 claim for arrest without probable cause are the same as the elements of a claim for false arrest under state law, *i.e.*, "(1) the defendant intended to confine [the plaintiff],

-11-

(2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (citation omitted). There is no requirement that an arrest be "in any sense formal." *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) (citation omitted). Rather, when an officer "even briefly detains an individual and restrains that person's right to walk away, he has effected a seizure and the limitations of the Fourth Amendment become applicable." *Id*. at 97. New York's high court explains:

> No checklist has yet been assembled that would facilitate mechanical determination of when a given set of circumstances equals an arrest. We have rejected as standards for determining when a *de facto* arrest has taken place the wholly subjective belief of the officer, as well as that of the citizen and looked instead to "what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position."

*People v. Hicks*, 68 N.Y.2d 234, 239-40 (1986) (citations omitted).

Defendants argue that, as a matter of law, Officer Boisclair did not arrest plaintiff. As defendants point out, in both her 50-h hearing and her deposition, plaintiff indicates that, after she told him to leave, Officer Boisclair went to the door and began to open it. Plaintiff does not testify that Officer Boisclair refused to leave, nor does she state that she believed she was under arrest.

The Court nevertheless finds that, construing the evidence in the light most favorable to plaintiff, there is enough in the record to resist summary judgment on this ground. According to plaintiff, Officer Boisclair gained entry into her home by threatening to arrest her; "backed" her into the house; refused to give her his name or speak to her or her daughter; "just stood ... with the arms crossed"; stated that Matthew "is coming in"; and intentionally struck her with the door when she told him to leave. Under all the circumstances, defendants have not established that no

-12-

rational trier of fact could find that a reasonable person in plaintiff's position would have believed she was confined.

Defendants further argue that, even assuming that Officer Boisclair did arrest plaintiff for obstructing governmental administration, he had probable cause to do so, based on her alleged conduct in resisting his efforts to allow Matthew to enter the house, and/or in interfering with Officer Boisclair as he attempted to leave the house.  "Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995) (citation omitted).  The inquiry focuses on the facts known to the arresting officer at the time of the arrest, *see Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007), viewed in light of the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 230 (1983).  An arresting officer's reasonable mistake about relevant facts does not undermine the existence of probable cause.  *See Williams v. Town of Greenburgh*, 535 F.3d 71, 79 (2d Cir. 2008).  Under New York Penal Law § 195.05, the offense of obstructing governmental administration is the intentional prevention or attempt to prevent a public servant from performing an official function by means of intimidation, force or interference, where the official function being performed is authorized by law.  *See Lennon*, 66 F.3d at 424.  Whether Officer Boisclair had probable cause to arrest plaintiff depends on factual issues that cannot be determined on this record, including what information Officer Boisclair had regarding whether Matthew had a right to enter, whether plaintiff invited Officer Boisclair into the house, and whether she interfered with him as he attempted to leave.

The same questions of fact bear on defendants' contention that, even assuming that

Officer Boisclair did arrest plaintiff, he is entitled to qualified immunity.  It cannot be determined on this record whether it was objectively reasonable for him to believe there was probable cause to arrest plaintiff, or whether officers of reasonable competence could disagree on whether there was probable cause to do so.  Accordingly, summary judgment dismissing the second cause of action is denied.

**Third Cause of Action – Excessive Force, Fourth Amendment**

Plaintiff's third cause of action, under section 1983, alleges that Officer Boisclair infringed her Fourth Amendment protection against unreasonable seizures of her person by subjecting her to excessive force.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989).  A law enforcement officer's use of force is excessive under the Fourth Amendment when his actions were "objectively unreasonable 'in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'"  *Maxwell v. City of N.Y.*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham*, 490 U.S. at 397); *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 1999).  If the trier of fact finds that Officer Boisclair restrained plaintiff in violation of her Fourth Amendment rights, and that the degree of force he used in restraining her was unreasonable, it could properly find on this record that Officer Boisclair subjected plaintiff to the use of excessive force.  Thus, questions of fact exist barring summary judgment.  By the same token, factual questions prevent the Court from granting summary judgment on the ground that Officer Boisclair is entitled to qualified immunity on this issue.  Summary judgment dismissing the third cause of action is denied.

**Fourth Cause of action – Substantive Due Process**

In the fourth cause of action, plaintiff claims: "Defendant's actions and use of excessive

-14-

force deprived the Plaintiff of her liberty interest in and due process right to bodily integrity as guaranteed to the Plaintiff by virtue of the Due Process Clause of the Fifth Amendment of the United States Constitution as made applicable upon the States by operation of the Fourteenth Amendment."  She adds: "Such due process violation is so severe as to shock the conscience of the Court."  Further, in opposition to the summary judgment motion, plaintiff contends that she has "demonstrated a violation of her due process rights via her testimony regarding her false arrest and malicious prosecution following the wrongful entry of the officer into her home without a search warrant" and that there was "no justification for the officer's actions."  In essence, plaintiff is asserting a substantive due process claim.

　　　　To the extent that plaintiff claims she was denied substantive due process by virtue of Officer Boisclair's alleged excessive force, false arrest, and wrongful entry, these claims are all properly analyzed under the Fourth Amendment, not as substantive due process claims.  *See United States v. Lanier*, 520 U.S. 259, 272, n.7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (citation and internal quotation marks omitted)); *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its

-15-

'reasonableness' standard, rather than under a 'substantive due process' approach."). Further, to the extent that plaintiff bases her substantive due process claim on her claim of malicious prosecution, it lacks merit as a matter of law. Judge Tarantino's dismissal of the charge against her means that she cannot prove that the prosecution terminated in her favor; nor can she show a deprivation of liberty resulting from the initiation or pendency of judicial proceedings, as is required for a constitutional malicious prosecution claim. *See Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000). The fourth cause of action for denial of substantive due process is dismissed in its entirety.

**Fifth Cause of Action – Retaliation, First Amendment**

In the fifth cause of action, plaintiff alleges as follows:

> Plaintiff's right to be secure in her house and to advise Defendant to "leave" her home is protected speech under the Free Speech Clause of the First Amendment of the United States Constitution as made applicable to the States by operation of the Fourteenth Amendment.

> Defendant's conduct complained of herein was intended to punish the Plaintiff for said speech.

> Therefore, Defendant's actions in assaulting, battering and arresting the Plaintiff for the exercise of her free speech rights constitutes a violation of Plaintiff's rights as guaranteed to her by virtue of the First Amendment of the United States Constitution as made applicable to the States by operation of the Fourteenth Amendment.

> By reason of this constitutional deprivation, Plaintiff has suffered serious personal injuries, loss of her liberty, fear, shame and humiliation.

(Paragraph numbering omitted.) In her Memorandum of Law in opposition to this motion, plaintiff argues: "The officer retaliated against the Plaintiff for exercising her constitutionally protected free speech rights when she demanded that he leave her home."

As a general rule, "the First Amendment prohibits government officials from subjecting an

-16-

individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quotations omitted). The Second Circuit has stated that, to prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

The parties in the instant case do not dispute that plaintiff had an interest protected by the First Amendment. As for the second requirement, evidence of improper motive "may include expressions by the officials regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." *Blue v. Koren*, 72 F.3d 1075, 1084 (2d Cir. 1995). Further, the Second Circuit has stated that, where an officer had probable cause, "we will not examine the officer's underlying motive in arresting and charging the plaintiff." *Singer v. Fulton Co. Sheriff*, 63 F.3d 110, 120 (2d Cir. 1995) (citations omitted); *accord Curley*, 268 F.3d at 73; *Anderson v. City of N.Y.*, 2011 WL 4403622, *14 (E.D.N.Y. Sept. 20, 2011). Questions of fact exist regarding Officer Boisclair's conduct and his motivation therefor. Questions of fact also exist regarding whether Officer Boisclair had probable cause to arrest plaintiff (if his conduct amounted to an arrest) and charge her with obstructing governmental administration.

Regarding the third *Curley* element, concerning the "chilling" effect of defendants' actions, a number of cases hold that, if a plaintiff proves an arrest or prosecution without probable cause, "there is no separate chilling requirement." *Bartels v. Incorporated Vill. of Lloyd*, 751 F.Supp.2d 387, 397 (E.D.N.Y. 2010); *accord Genia v. New York State Troopers*, 2007 WL

-17-

869594, *24 (E.D.N.Y. Mar. 20, 2007); *compare Curley* (jury found probable cause to arrest). Cases also hold that, where, as here, a plaintiff claims harm independent of the chilling of speech, proof of chilling is not required.  *See Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005) (discussing *Curley*); *Bartels*, 751 F.Supp.2d at 397.  As stated, questions of fact exist regarding Officer Boisclair's conduct and whether there was probable cause to arrest or charge plaintiff. Questions of fact also exist whether Officer Boisclair's actions caused plaintiff physical or other injury independent of any chilling of speech.  The Court notes also that plaintiff did give some testimony at her 50-h hearing relevant to the issue of a chilling effect.  Clearly, questions of fact bar summary judgment dismissing the fifth cause of action.

**Sixth Cause of Action – Free Speech, New York State Constitution**

The principles applicable to plaintiff's First Amendment claim, discussed above, also apply to her free speech claim of retaliation under Article I, section 8 of the New York State Constitution.  *See Rotundo v. Village of Yorkville*, 2011 WL 838892, *4, n.8 (N.D.N.Y. Mar. 4, 2011); *Burns v. Cook*, 458 F.Supp.2d 29, 38, n.3 (N.D.N.Y. 2006).  Summary judgment dismissing this claim is denied.

**Seventh Cause of Action – Due Process, New York State Constitution**

In the seventh cause of action, plaintiff claims that the actions of Officer Boisclair as set forth in the complaint constitute a violation of her "right to not be deprived of her life, liberty or property without due process of law as guaranteed to Plaintiff by Article I § 6 of the New York State Constitution."  Numerous district courts in this circuit have held, however, that where an adequate alternative remedy exists, a State constitutional remedy will not be recognized.  *See, e.g., Krug v. County of Rennselaer*, 559 F.Supp.2d 223, 247-48 (N.D.N.Y. 2008) ("[V]arious

-18-

federal courts in this circuit have held that 'there is no private right of action under the New York State Constitution where ... remedies are available under § 1983." (citation omitted)); *Muhammad v. New York City Transit Auth.*, 450 F.Supp.2d 198, 212 (E.D.N.Y. 2006) (dismissing state constitutional tort claim where defendant has state law avenue for redressing alleged discrimination); *Flores v. City of Mount Vernon*, 41 F.Supp.2d 439, 447 (S.D.N.Y. 1999) ("[N]o private right of action exists for violations of the New York State Constitution where a Plaintiff has alternative damage remedies available"); *Wahad v. F.B.I.*, 994 F.Supp. 237, 240 (S.D.N.Y. 1998) (declining to imply a cause of action under Article I, section 6 of the New York State Constitution; stating that "the existence of alternative damage remedies under Section 1983 obviates the need to imply a private right of action under the State Due Process Clause."); *see also Lyles v. State*, 770 N.Y.S.2d 81, 82 (2d Dep't 2003), *aff'd on other grounds*, 3 N.Y.3d 396 (2004) ("[T]he recognition of the claimant's State constitutional claims was neither necessary nor appropriate to ensure the full realization of his rights, because the alleged wrongs could have been redressed by an alternative remedy, namely, timely interposed common-law tort claims[.] ").

Plaintiff does not articulate any basis to find that remedies available under section 1983 and New York common law are not adequate.  The seventh cause of action is dismissed.

**Eighth Cause of action – Assault, New York State Law**

Plaintiff claims that Officer Boisclair threatened her with physical harm and arrest, thereby constituting assault.  New York courts define civil assault as an intentional attempt or threat to do injury or commit a battery; thus, to prevail in a civil action for tort, a plaintiff must prove "physical conduct placing plaintiff in imminent apprehension of harmful contact."  *Marilyn S. v. Independent Grp. Home Living Program, Inc.*, 903 N.Y.S.2d 403, 406 (2d Dep't 2010);

*accord United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993). Based on plaintiff's version of events, a trier of fact could conclude that Officer Boisclair engaged in such conduct.  Officer Boisclair's denial that he engaged in such conduct raises material questions of fact.  Summary judgment dismissing the eighth cause of action is denied.

**Ninth Cause of Action – Battery, New York State Law**

Under New York law, civil battery is "an intentional wrongful physical contact with another person without consent."  *Charkhy v. Altman*, 678 N.Y.S.2d 40, 41 (1st Dep't 1998) (quoting *United Nat'l Ins. Co.*, 994 F.2d at 108).  Plaintiff's allegation that Officer Boisclair hit her with the door meets this definition.  The Court notes that, except for section 1983's requirement that the tort be committed under color of state law, the essential elements of a section 1983 excessive force claim and a state law assault and battery claim are "substantially identical." *Posr*, 944 F.2d 94-95 (2d Cir. 1991); *accord Humphrey v. Landers*, 344 Fed.Appx. 686, 688 (2d Cir. 2009).  The Court has already found material questions of fact barring summary judgment on plaintiff's section 1983 excessive force claim.  For the same reason, summary judgment dismissing plaintiff's state law battery claim is denied.

**Tenth Cause of Action – Malicious Prosecution, Fourth Amendment**

Plaintiff's section 1983 claim of malicious prosecution lacks merit as a matter of law. Judge Tarantino's dismissal of the charge against her means that she cannot prove that the prosecution terminated in her favor; nor can she show a deprivation of liberty resulting from the initiation or pendency of judicial proceedings, as is required for a constitutional malicious prosecution claim.  *See Rohman*, 215 F.3d at 215.  The tenth cause of action is dismissed.

**Eleventh Cause of Action – Malicious Prosecution, New York State Law**

Under New York law, "[i]n the absence of a favorable resolution, an action for malicious prosecution may not be maintained." *Ward v. Silverberg*, 85 N.Y.2d 993, 994 (1995).  New York's high court "has consistently held that a criminal action is terminated in the accused's favor for purposes of a malicious prosecution claim where a judicial determination of the accused's innocence on the merits of the action has been made." *Id*. (citations and internal quote omitted).  In the case at bar, plaintiff's prosecution for obstructing governmental justice did not terminate in her favor.  This cause of action is dismissed.

**Twelfth Cause of Action – *Monell* liability**

Plaintiff does not oppose dismissal of the twelfth cause of action, a claim that the municipality is liable for failing properly to supervise and discipline Officer Boisclair.  *See Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694-95 (1978); *Harper v. City of N.Y.*, 424 Fed.Appx. 36, 38 (2d Cir. 2011).  Plaintiff does not mention this cause of action in her opposition papers, and the Court deems it to be abandoned.  In any event, there is no evidence in the record regarding this cause of action, other than the conclusory allegations in the complaint. The twelfth cause of action is dismissed.

**Conditional Preclusion Order**

In their summary judgment motion, defendants request preclusion of all evidence regarding plaintiff's claim for psychological damages.  By text order dated February 16, 2011, Magistrate Judge Treece ordered: "Plaintiff shall serve unrestricted medical authorizations for treating physicians, whether psychiatric or orthopedic."  Defendants' counsel states that plaintiff provided an authorization for Dr. Isele for psychotherapy notes at her deposition on May 5, 2011, but that subsequently, Dr. Isele refused to provide any of those records, stating that plaintiff had

rescinded the authorization.  On July 1, 2011, Magistrate Judge Treece issued a text order stating in part:

> Defendants claim that a previously issued medical authorization was orally rescinded by the Plaintiff. Even though discovery demands and responses are not supposed to be filed on the case docket, which includes expert reports, the Court reviewed said report which reveals that Dr. Isele will be called as a treating physician. In this respect, Defendants are entitled to a medical authorization and records directly from Dr. Isele. Moreover, if the Plaintiff is seeking damages for emotional and psychological injuries, an authorization is required on this account. If the Plaintiff disagrees with this analysis, then the parties shall file the dates and times that they may be available for a telephone conference during the week ending July 8, 2011, and July 11, 2011.

(Citations to docket omitted.)  Plaintiff has not contacted defendants' counsel or Magistrate Judge Treece regarding this issue, nor has she provided another authorization.

Plaintiff's counsel responds that "plaintiff does not object to this discovery," and states: "The Plaintiff duly executed a HIPAA form permitting Defendants to obtain the record of her treatment with her psychologist. Defendants have failed to provide any evidence that such permission has been revoked by the Plaintiff."  Plaintiff does not deny revoking the authorization.

The Court conditionally grants defendants' preclusion request.  All evidence regarding plaintiff's claim for psychological damages will be precluded at trial unless, within 15 days of the date this Memorandum-Decision and Order is docketed, plaintiff provides to defendants' counsel an unrestricted authorization for Dr. Isele's records, psychotherapy notes, and any other relevant evidence in his possession.

## CONCLUSION

It is therefore

ORDERED that defendants' motion (Dkt. No. 19) for summary judgment is granted in

-22-

part and denied in part; and it is further

ORDERED that summary judgment is granted to the extent of dismissing the following causes of action: Fourth; Seventh; Tenth; Eleventh; and Twelfth; and it is further

ORDERED that summary judgment is denied regarding the following causes of action insofar as they are alleged against Officer Boisclair: First; Second; Third; Fifth; Sixth; Eighth; and Ninth; and it is further

ORDERED that any and all claims against the defendants "unknown members of the Glens Falls Police Department" are dismissed; and it is further

ORDERED that all claims against the City of Glens Falls and the Glens Falls City Police Department are dismissed; and it is further

ORDERED that all evidence regarding plaintiff's claim for psychological damages will be precluded at trial unless, within 15 days of the date this Memorandum-Decision and Order is docketed, plaintiff provides to defendants' counsel an unrestricted authorization for Dr. Isele's records, psychotherapy notes, and any other relevant evidence in his possession; and it is further

ORDERED that this case is deemed Trial Ready as of March 16, 2012.  The Jury Trial is set for June 25, 2012, at 9:00 a.m., in Syracuse, NY, before the undersigned.  All pretrial papers including any motion(s) in limine, are due on or before June 11, 2012.  Any response(s) to the motion in limine are due on June 18, 2012.

IT IS SO ORDERED.

January 20, 2012
Syracuse, New York

Honorable Norman A. Mordue
U.S. District Judge